**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**RANDALL CREMEANS,**

    **Petitioner,**

    **v.**

**WARDEN, ROSS CORRECTIONAL
INSTITUTION,**

    **Respondent.**

**CASE NO. 2:18-CV-633
CHIEF JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Chelsey M. Vascura**

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings this Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court on the Petition, Respondent's Return of Writ, and the exhibits of the parties. For the reasons that follow, it is **RECOMMENDED** that this action be **DISMISSED**.

### I.    Facts and Procedural History

The Ohio Fifth District Court of Appeals summarized the facts and procedural history of the case as follows:

{¶ 2} The following evidence is adduced from the record of appellant's jury trial.

Hendricks Accuses Appellant of Theft

{¶ 3} On April 17, 2015, around 6:00 p.m., Tameka Alexander was at home in Zanesville with her two minor children, "Jane Doe" and "Mary Doe," when several friends stopped by, including minors "B.B." and "C.C.," Jeremiah Marple, and Samantha Evans. Tameka was pregnant at the time. Tameka's boyfriend Brent Mayle also lives at the home but was not present during these events. Mayle knows appellant and appellant had been to the house several times.

{¶ 4} The day before, appellant purportedly met Christopher Hendricks for the first time. On April 17, Hendricks confronted appellant about stolen items in appellant's possession, including two T.V.s and a game system.FN1 The stolen items belonged to Hendricks. Hendricks said Tameka and Mayle told him appellant stole the items.

Appellant denied the theft and asserted he bought the items from Mayle. Hendricks told appellant they were going to Tameka's house to "straighten this out."

FN1: At trial a question arose whether the stolen items included a locked safe; appellant denied knowledge of a safe and other witnesses mentioned only the electronics as the disputed items.

Appellant and Hendricks Confront Tameka

{¶ 5} Around 6:00 p.m., Tameka, her daughters, and the friends were inside the house when appellant walked in the door, closely followed by Hendricks, who shut and locked the door behind him. Appellant told Tameka to tell Hendricks appellant didn't take his stuff. The scene became chaotic.

{¶ 6} Hendricks' purpose was to find Mayle. He immediately became irate and confrontational; he pulled a gun and "waved it around," yelling. Hendricks pointed his gun at everyone present, including at Jane and Mary Doe and at Tameka's stomach. Hendricks told Tameka and the children to sit down on the couch.

{¶ 7} Hendricks took Tameka's cell phone, put his gun to Jane Doe's head and told Tameka to give him her password. Hendricks called Mayle using the phone and told him he had until 10:00 p.m. to get home "and deal with his shit" or he wouldn't have a home to return to. B.B. heard him ask Mayle where he was and where his money was.

{¶ 8} Meanwhile, appellant grabbed Tameka's daughter and called Tameka a "stupid bitch" for putting her kids through this and not cooperating with Hendricks fast enough. He also tried to kick Tameka.

{¶ 9} Appellant told Hendricks they should leave because Mayle was probably calling the police, and the victims heard the two discussing whether they should bring the victims with them. B.B. heard appellant tell Hendricks there wasn't enough room to take all of the victims. Appellant suggested instead that they take the victims' cell phones and I.D.s. Hendricks told appellant to "tie them up."

{¶ 10} Accounts varied as to whether appellant had a gun. Tameka said he had a gun which he sometimes put in his pocket and at other times waved in the air. Tameka testified she did not remember a description of appellant's gun, although it was smaller than Hendricks,' which was gray and black and "pocket size." She did not see the gun well enough to describe it. B.B. agreed that both appellant and Hendricks had "small" guns and both yelled at Tameka about tracking down Mayle. B.B. described appellant's gun as black and gray.

{¶ 11} C.C., Evans, Marple, and B.B. were tied up with phone charging cords and electronics cords. Accounts varied as to which suspect tied up the victims. Tameka testified both appellant and Hendricks tied people up, but did not recall which

suspect tied which victim. B.B. only saw Hendricks tying people up but acknowledged she was terrified and only focused on what was happening to her, not the others.

{¶ 12} Tameka and her daughters remained on the couch while the friends, now tied up, sat against the stairs. B.B. testified Hendricks told the group not to say anything because "they got money and money gets you what you want," which she took as a threat.

{¶ 13} Appellant and Hendricks left the house and got in Hendricks' car, but Hendricks came back inside because he forgot his keys. C.C., B.B., Marple, and Evans untied themselves in the meantime and ran to their own car. Appellant went to the victims' car and took the keys out of the ignition, telling them not to leave until he and Hendricks were gone.

{¶ 14} Hendricks returned to the car and drove off with appellant.

{¶ 15} C.C. testified reluctantly at trial. She said appellant was in shock during the incident and she believes he only helped to tie up one victim other than her. C.C. said appellant hugged her and tried to untie her. C.C. also testified, however, that it was appellant's idea to take the victims' I.D.s "in case anyone snitched." C.C. said appellant tried to calm the situation and she only saw one gun during the entire incident, which was brandished by Hendricks.

{¶ 16} Samantha Evans also testified only Hendricks showed a gun. She did not recall who tied up the victims. She recalled Hendricks threatening them not to snitch because he "has money and money can get him what he wants." Hendricks also said he had seven bullets, or one for everyone in the house. She testified that appellant and Hendricks discussed taking the victims with them, but appellant suggested they should take their cell phones and I.D.s instead. Appellant asked Evans for her I.D. and she said it was outside in the car, in her jacket pocket. Appellant left the house and brought the jacket back in for Evans to hand over the I.D.

{¶ 17} Evans further testified that appellant and Hendricks left the house but were still outside in their car when she and the others ran outside to their own car. Evans testified appellant came over to their car, took the keys out of the ignition and dropped them inside the car, telling them to wait until he and Hendricks left.

Appellant's Testimony, Cross Examination, and Rebuttal

{¶ 18} Appellant testified on his own behalf at trial. He acknowledged his record of felony convictions. Appellant said his plan in taking Hendricks to Tameka's house on April 17 was simply to ask her why she told Hendricks appellant stole his stuff. He walked into the house without knocking because he was accustomed to doing so and the door was unlocked.

{¶ 19} Appellant testified he was shocked that Hendricks immediately became angry, pulling a gun and threatening Tameka. Hendricks locked the door and said no one was leaving until he got his stuff. Appellant said he was trying to calm the frightened kids and victims as Hendricks yelled, waved a gun and threatened everyone.

{¶ 20} Appellant admitted he argued with Tameka, that he told her to tell Hendricks where Mayle was and asked whether she loved her kids. Appellant insisted Hendricks alone tied the victims up while appellant walked around aimlessly, not knowing what to do. He heard Hendricks call Mayle from Tameka's phone, and heard Mayle say he wasn't returning to the house. In response Hendricks told Mayle he would kill everyone in the house. Mayle hung up on Hendricks, and appellant testified he tried to get Hendricks to leave by warning him Mayle was probably calling police. Hendricks was irate and said they were taking everyone with them, to which appellant suggested they take the I.D.s instead. Appellant said he tried to untie one of the victims but Hendricks stopped him, saying they had to leave immediately. Appellant got in the car with Hendricks because he was scared. Hendricks realized he left his car keys in the house and went back in.

{¶ 21} Appellant said it was Hendricks who went to the victims' car and removed the keys from the ignition, telling the victims not to leave until they were gone.

{¶ 22} Appellant said he was trying to reason with Hendricks throughout the incident, telling him he had "nothing to do with it," meaning the theft of Hendricks' items. Appellant said Hendricks dropped him off and the two never spoke again.

{¶ 23} Appellant insisted he did not have a gun on April 17, never displayed a gun, and never claimed he had a gun or bullets. He only suggested taking the victims' I.D.s so that Hendricks would not feel it necessary to take the victims with them when they fled the house. Appellant denied taking anyone's phones and denied tying anyone up. He said he had no idea what Hendricks planned to do when they went to Tameka's house. He was "in shock" throughout the incident but couldn't stop Hendricks because Hendricks had a gun.

{¶ 24} Appellant testified he turned himself in to police shortly after he heard police were looking for him, although he admitted he was "too scared" to go to the police on his own immediately after the incident.

{¶ 25} On cross-examination, appellant was queried about events leading up to the incident at Tameka's house. He claimed that Hendricks was "not aggressive" when he confronted appellant about his stolen belongings, but he also said that the night before, Hendricks' "crew" had marched appellant through a dark alley and he thought they would shoot him. Appellant continued the next day to insist he hadn't stolen Hendricks' items, and Hendricks then told him they were going to Tameka's house to "straighten this out." Appellant testified he did not tell Detective Hill, the

lead investigator, that Hendricks called him the next day and "wanted to go do it again."

{¶ 26} Appellee called Hill as a rebuttal witness. Hill testified that during the interview, appellant told him Hendricks called him the next day and "wanted me to go again, bro."

Indictment, Trial, and Conviction

{¶ 27} Appellant was charged by indictment as follows: Count I, aggravated burglary pursuant to R.C. 2911.11(A)(2), a felony of the first degree; Counts II through V, kidnapping pursuant to R.C. 2905.01(A)(2), all felonies of the first degree; Counts VI through VIII, kidnapping pursuant to R.C. 2905.01(A)(3), all felonies of the first degree; Counts IX through XIII, aggravated robbery pursuant to R.C. 2911.01(A)(1), all felonies of the first degree; and Counts XIVFN2 and XV, having weapons while under disability pursuant to R.C. 2923.13(A)(2) and (A)(3), both felonies of the third degree. Counts I through XIII are accompanied by firearm specifications pursuant to R.C. 2941.145.

FN2: The Entry of appellant's arraignment notes appellant was indicted upon each count absent Count XIV, having weapons while under disability. Appellant did not enter a not guilty plea to Count XIV and no further mention of Count XIV is contained in the record.

{¶ 28} Appellant entered pleas of not guilty and waived his right to trial by jury as to Count XV, weapons under disability, only.

{¶ 29} The remaining counts proceeded to trial by jury and appellant was found guilty upon Counts I through XI.FN3 The trial court found appellant guilty upon Count XV, weapons under disability. Both parties submitted sentencing memoranda. A sentencing hearing was held on November 4, 2015 and by entry dated November 19, 2015, the trial court imposed a total aggregate prison term of 30 years.

FN3: Appellee's brief states two counts of aggravated robbery were nolled.

{¶ 30} Appellant now appeals from the judgment entries of his convictions and sentence.FN4

FN4: Appellant filed a pro se motion for new trial on January 5, 2016, supplemented by counsel on March 17, 2016. The trial court held an evidentiary hearing and overruled the motion for new trial by judgment entry dated April 5, 2016. Appellant has also filed a notice of appeal from that judgment entry. See, Fifth District Court of Appeals, Muskingum County Case No. CT2016-0018.

{¶ 31} Appellant raises four assignments of error:

ASSIGNMENTS OF ERROR

{¶ 32} "I. THE APPELLANT WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL CONTRARY TO THE STATE AND FEDERAL CONSTITUTIONS WHEN, AMONG OTHER THINGS, HE DID NOT REQUEST A JURY INSTRUCTION ON THE AFFIRMATIVE DEFENSES OF DURESS AND NECESSITY."

{¶ 33} "II. THE GUILTY VERDICTS FOR AGGRAVATED BURGLARY, AGGRAVATED ROBBERY WITH A FIREARM SPECIFICATION, KIDNAPPING WITH A FIREARM SPECIFICATION, AND HAVING A WEAPON WHILE UNDER DISABILITY AGAINST APPELLANT WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND CONTRARY TO LAW."

{¶ 34} "III. THE TRIAL COURT VIOLATED APPELLANT'S STATE AND FEDERAL DOUBLE JEOPARDY PROTECTIONS, STATE AND FEDERAL RIGHTS TO DUE PROCESS, AND R.C. 2941.25 BY FAILING TO MERGE THE ALLIED OFFENSES OF AGGRAVATED BURGLARY, AGGRAVATED ROBBERY, AND KIDNAPPING WHICH WERE BASED ON THE SAME ACT OF VIOLENCE."

{¶ 35} "IV. THE TRIAL COURT PLAINLY ERRED IN IMPOSING CONSECUTIVE SENTENCES FOR APPELLANT'S SEPARATE CONVICTIONS RENDERING THE SENTENCES CONTRARY TO LAW."

*State v. Cremeans*, 5th Dist. No. CT2015-0062, 2016 WL 6963176, at *1-4 (Ohio Ct. App. Nov. 17, 2016). On November 17, 2016, the appellate court affirmed the judgment of the trial court. *Id*. Petitioner did not file a timely appeal. On February 27, 2017, he filed a motion for a delayed appeal. (ECF No. 7, PAGEID # 202.)[1] On April 19, 2017, the Ohio Supreme Court denied the motion for a delayed appeal. *State v. Cremeans*, 148 Ohio St.3d 1442 (Ohio 2017).

Petitioner pursued other state relief:

---

[1] As cause for his untimely appeal, Petitioner stated that neither the Court of Appeals nor his appellate counsel sent him a copy of the appellate court's decision, and he did not learn until January 29, 2017, that the appellate court had denied his appeal. (ECF No. 7, PAGEID # 203.) He further alleges he had limited access to the prison's law library, and the prison's mail system took up to one week to process his outgoing mail. (PAGEID # 204.)

{¶ 4} On November 25, 2015, appellant filed a pro se motion for new trial with the trial court. A supplemental motion was filed by counsel on March 17, 2016. A hearing was held on April 5, 2016. By judgment entry filed same date, the trial court denied the motion.

{¶ 5} Appellant filed an appeal and this matter is now before this court for consideration. Assignments of error are as follows:

I

{¶ 6} "THE LOWER COURT VIOLATED THE APPELLANT'S CONSTITUTIONAL RIGHT TO DUE PROCESS OF LAW."

II

{¶ 7} "THE LOWER COURT VIOLATED THE APPELLANT'S CONSTITUTIONAL RIGHT TO CONFRONTATION OF THE WITNESSES AGAINST HIM."

III

{¶ 8} "THE TRIAL COURT VIOLATED THE SEPARATION OF WITNESS DOCTRINE THAT CONTRIBUTED TO THE DENIAL OF A FAIR TRIAL AND DUE PROCESS OF LAW TO APPELLANT."

IV

{¶ 9} "THE TRIAL COURT ABUSED ITS DISCRETION IN NOT GRANTING THE APPELLANT A NEW TRIAL AND/OR THERE IS SUFFICIENT EVIDENCE IN THE RECORD FOR THIS APPELLATE COURT TO ORDER A NEW TRIAL ."

V

{¶ 10} "THE STATE OF OHIO VIOLATED U.S. VS. BRADY AND WAS GUILTY OF MISCONDUCT AND COMPELLED A WITNESS TO IMPROPERLY TESTIFY."

*State v. Cremeans*, 5th Dist. No. CT2016-0018, 2017 WL 235214, at *1 (Ohio Ct. App. Jan. 17, 2017). On January 17, 2017, the appellate court affirmed the judgment of the trial court. *Id.* On July 5, 2017, the Ohio Supreme Court declined to accept jurisdiction of the appeal. *State v. Cremeans*, 149 Ohio St.3d 1464 (Ohio 2017).

On June 29, 2018, Petitioner filed this *pro se* Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He asserts that he was denied due process when the trial court denied his motion for a new trial on a claim under *Brady v. Maryland,* 373 U.S. 83 (1963), based on the alleged false testimony of a prosecution witness (claim one); that he was denied the effective assistance of counsel, because his attorney failed to call defense witnesses or request a jury instruction on duress (claim two); that he was denied his right to confront witnesses against him (claim three); and that his convictions violate the Double Jeopardy Clause (claim four). It is the position of the Respondent that these claims are procedurally defaulted or without merit.

## II.    Standard of Review

Because Petitioner seeks habeas relief under 28 U.S.C. § 2254, the standards of the Antiterrorism and Effective Death Penalty Act ("the AEDPA") govern this case. The United States Supreme Court has described the AEDPA as "a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court" and emphasized that courts must not "lightly conclude that a State's criminal justice system has experienced the 'extreme malfunction' for which federal habeas relief is the remedy." *Burt v. Titlow*, 571 U.S. 12, 20 (2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)); *see also Renico v. Lett*, 559 U.S. 766, 773 (2010) ("AEDPA . . . imposes a highly deferential standard for evaluating state-court rulings, and demands that state court decisions be given the benefit of the doubt.") (internal quotation marks, citations, and footnote omitted).

The AEDPA limits the federal courts' authority to issue writs of habeas corpus and forbids a federal court from granting habeas relief with respect to a "claim that was adjudicated on the merits in State court proceedings" unless the state-court decision either

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Further, under the AEDPA, the factual findings of the state court are presumed to

be correct:

In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

Accordingly, "a writ of habeas corpus should be denied unless the state court decision

was contrary to, or involved an unreasonable application of, clearly established federal law as

determined by the Supreme Court, or based on an unreasonable determination of the facts in light

of the evidence presented to the state courts." *Coley v. Bagley*, 706 F.3d 741, 748 (6th Cir. 2013)

(citing *Slagle v. Bagley*, 457 F.3d 501, 513 (6th Cir. 2006)), *cert. denied sub nom. Coley v.*

*Robinson,* 134 S.Ct. 513 (2013). The United States Court of Appeals for the Sixth Circuit has

summarized these standards as follows:

A state court's decision is "contrary to" Supreme Court precedent if (1) "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law[,] or (2) "the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives" at a different result. *Williams v. Taylor*, 529 U.S. 362, 405. 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court's decision is an "unreasonable application" under 28 U.S.C. 2254(d)(1) if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context. *Id*. at 407, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389.

*Id.* at 748-49.  The burden of satisfying the AEDPA's standards rests with the petitioner.  *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

### III.    Analysis

### A.    Claims One and Three

In claim one, Petitioner asserts that he was denied due process because the prosecutor violated *Brady*, in view of an affidavit from Tamica Alexander recanting her trial testimony as false.  In claim three, Petitioner asserts that he was denied his right to confront the witnesses against him, because the prosecutor failed to call Jerimiah Marple to testify after Marple purportedly changed his statement against the Petitioner.  The state appellate court rejected these claims, reasoning as follows:

> {¶ 11} Appellant claims the trial court abused its discretion in denying his motion for new trial. Specifically, appellant claims he was denied due process, [and] denied the right to confront witnesses[.] . . . We disagree.

> {¶ 12} Crim.R. 33 governs motions for new trial and states the following in pertinent part:

> (A) Grounds. A new trial may be granted on motion of the defendant for any of the following causes affecting materially his substantial rights:

> (1) Irregularity in the proceedings, or in any order or ruling of the court, or abuse of discretion by the court, because of which the defendant was prevented from having a fair trial;

> (6) When new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial. When a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must produce at the hearing on the motion, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given, and if time is required by the defendant to procure such affidavits, the court may postpone the hearing of the motion for such length of time as is reasonable under all the circumstances of the case. The prosecuting attorney may produce affidavits or other evidence to impeach the affidavits of such witnesses.

{¶ 13} "A motion for new trial pursuant to Crim.R. 33(B) is addressed to the sound discretion of the trial court, and will not be disturbed on appeal absent an abuse of discretion." *State v. Schiebel*, 55 Ohio St.3d 71 (1990), paragraph one of the syllabus. In order to find an abuse of discretion, we must determine the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. *Blakemore v. Blakemore*, 5 Ohio St.3d 217 (1983).

{¶ 14} In his motion for new trial and supplemental motion for new trial, appellant argued newly discovered evidence. . . . Appellant submitted the affidavits of Tamica Alexander, Jeremiah Marple, Misti Simms, and Joni Bocook. Defense counsel subsequently withdrew the affidavit of Mr. Marple due to its inaccuracy. T. at 56.

{¶ 15} Appellant argued newly discovered evidence in the form of an affidavit and audio recording of trial witness Tamica Alexander admitting to committing perjury, specifically, that she had lied on the stand about appellant having a gun during the incident. We note Ms. Alexander did not sign her affidavit attached to the November 25, 2015 motion and therefore it lacked evidentiary quality.

{¶ 16} As explained by the Supreme Court of Ohio in *State v. Petro*, 148 Ohio St. 505 (1947), syllabus:

To warrant the granting of a motion for a new trial in a criminal case, based on the ground of newly discovered evidence, it must be shown that the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence. (*State v. Lopa*, 96 Ohio St. 410, 117 N.E. 319, approved and followed.)

{¶ 17} During the April 5, 2016 motion hearing, defense counsel waived hearing and wished to rest on the submitted affidavits. T. at 5. The state desired to go forward with the hearing in order to dispel alleged falsehoods in the affidavits submitted by appellant. T. at 6–7. The trial court proceeded with the hearing, and defense counsel called Ms. Alexander to the stand. T. at 17–18. Ms. Alexander testified she wrote out an affidavit (Defendant's Exhibit A) and gave a sworn audio recording (Defendant's Exhibit B) to Attorney Adam Grosshandler wherein she stated she lied on the stand during the trial about appellant having a gun during the incident. T. at 20–21. The audio recording was played to the trial court and was transcribed into the record. T. at 22, 74–77. On cross-examination, Ms. Alexander stated she did not lie when she testified during the trial that appellant had a gun. T. at 25. She explained she made the affidavit and the audio recording because "I was put on the spot" and she felt pressured to do so. *Id*. She stated she was telling the truth when she testified at trial that appellant had a gun during the incident. *Id*. Ms. Alexander agreed that she was concerned about appellant receiving a thirty year

sentence and she thought "it would help him to get a lesser sentence" if she "lied and said he didn't have a gun." T. at 26. On redirect, Ms. Alexander stated when she testified during trial, she was sure appellant had a gun. T. at 28. Ms. Alexander explained she made the affidavit and the audio recording because appellant's sister, Sierra, kept insisting to her over and over that appellant did not have a gun and Ms. Alexander wanted to "shut her up." T. at 30.

{¶ 18} Following Ms. Alexander's testimony, defense counsel called Joni Bocook to the stand. Ms. Bocook stated Ms. Alexander had told her on the day of her trial testimony that she was not one hundred percent sure if appellant had a gun during the incident. T. at 35.

{¶ 19} The next witness called by defense counsel was Misty Sims. Ms. Sims stated during the trial, she observed witnesses sitting together outside in the hallway. T. at 47. She stated they were talking about their testimony. T. at 47–48. The only time she heard the mention of appellant having a gun was when Ms. Alexander was talking to her mother, who did not testify at the trial. T. at 48. Ms. Sims stated she "saw all the girls come out one at a time" and agreed "they would then go and tell their story to the next person that would go in and testify." T. at 50–51. Ms. Alexander denied sitting out in the hallway with the other witnesses, and denied and did not recall talking to others about her testimony. T. at 32–33.

{¶ 20} The next witness, Attorney Grosshandler was unavailable, so defense counsel proffered his testimony, and the state so stipulated, that he would testify that he did not witness "anybody being pressured, that there wasn't any pressure put upon" Ms. Alexander during the making of the audio recording and in fact, Ms. Alexander voluntarily came in to give her statement. T. at 52–53.

{¶ 21} During argument to the trial court, defense counsel agreed with the trial court that during the trial, Brianna Baker also testified that appellant had a gun during the incident. T. at 61.

At the conclusion of the hearing, the trial court denied the motion for new trial. T. at 74.

{¶ 22} As explained by this court in *State v. Howard*, 5th Dist. Stark No.2014CA00136, 2015–Ohio–2053, ¶ 13:

The defendant is not entitled to a new trial merely because an important witness recants. *State v. Brown*, 186 Ohio App.3d 309, 927 N.E.2d 1133, 2010–Ohio–405, ¶ 20 (7th Dist. Mahoning). If the newly discovered evidence is a recantation by a main prosecution witness, the trial court must make two determinations: "(1) which of the contradictory testimony offered by the recanting witness is credible and true, and if the recanted testimony is to believed; (2) would the evidence materially affect the outcome of the trial?" *Id.*, citing *Toledo v. Easterling*, 26 Ohio App.3d 59, 62, 498 N.E.2d 198, (1985). Newly discovered evidence must do more than merely

impeach or contradict evidence at trial, and there must be a compelling reason to accept a recantation over the trial testimony of the witness. *Id.* A recanting witness is to be viewed with extreme suspicion because the witness, by making contradictory statements, either lied at trial, or in the current testimony, or both times. *Id.*

{¶ 23} As noted by the trial court: "And then she [Ms. Alexander] came back in here today and under oath reaffirmed what she said at trial. So every time she's been in front of this Court under oath she said Mr. Cremeans had a gun. There's other evidence that Mr. Cremeans had a gun, so it's not solely based on what Ms. Alexander says." T. at 66.

{¶ 24} We do not find any violation of appellant's due process rights by the trial court proceeding with the hearing. Full and complete testimony was presented to the trial court regarding Ms. Alexander's recantation. From the record, we find the trial court did not abuse its discretion in finding Ms. Alexander's recantation of prior testimony to be false and/or would not materially affect the outcome of the trial. Any arguments involving Mr. Marple and the confrontation clause are meritless given appellant's withdrawal of Mr. Marple's affidavit due to inaccuracies. In addition, appellant could have called Mr. Marple to the stand during the hearing. . . .

{¶ 25} Upon review, we find the trial court did not abuse its discretion in denying the motion for new trial.

\*\*\*

{¶ 27} Appellant claims prosecutorial misconduct in the prosecutor withholding exculpatory evidence and compelling a witness to improperly testify. We disagree.

{¶ 28} Appellant argues the prosecutor withheld exculpatory evidence by failing to have one of the witnesses, Jeremiah Marple, testify during the trial and "sent him away" from the courthouse. Appellant's Brief at 27. Appellant argues Mr. Marple would have testified that appellant did not have a gun during the incident, "that he tried to help the situation and that his actions probably saved their lives." *Id.* Appellant also argues the prosecutor withheld the fact that Ms. Alexander "tried to tell the Prosecution that her original statement was incorrect in that she did not think that" appellant had a gun. *Id.* at 28.

{¶ 29} Ms. Alexander testified during the trial and was subject to cross-examination. Appellant does not argue that Mr. Marple, as a victim, was not disclosed as a potential witness by the prosecution. If the state chose not to call Mr. Marple to the stand, defense counsel could have called him as a witness.

{¶ 30} This issue of "prosecutorial misconduct" does not constitute "newly discovered evidence" and could have been raised on direct appeal.

Under the doctrine of res judicata, a final judgment of conviction bars the convicted defendant from raising and litigating in any proceeding, except an appeal from that judgment, any defense or any claimed lack of due process that was raised or could have been raised by the defendant at the trial which resulted in that judgment of conviction or on an appeal from that judgment.

*State v. Perry*, 10 Ohio St.2d 175, 180 (1967).

*State v. Cremeans*, 2017 WL 235214, at *1-4.[2]

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. *Brady v. Maryland*, 373 U.S. 83, 86 (1963). Evidence is material "[i]f there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). The duty to disclose such evidence is applicable even though there has been no request by the accused. *United States v. Agurs*, 427 U.S. 97, 107 (1976).

[T]here is never a real "Brady violation" unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.

*Strickler v. Greene*, 527 U.S. 263, 281 (1999). "Impeachment evidence, as well as exculpatory evidence, falls within the *Brady* rule." *O' Guinn v. Dutton*, 88 F.3d 1409, 1418 (6th Cir.1996) (citing *Bagley, supra*); *Connick v. Thompson*, 563 U.S. 51, 99, n. 16 (2011) (quoting *Bagley*, 473 U.S. at 676). "In the absence of prejudice, even assuming a violation of *Brady*, reversal is

---

[2] Petitioner's claims may be procedurally defaulted. Petitioner did not raise the issue on direct appeal, and the state appellate court indicated that his claims therefore were barred from review under Ohio's doctrine of *res judicata*. *See, e.g., Brigner v. Warden, Chillicothe Corr. Inst.*, No. 2:17-cv-1045, 2018 WL 1046954, at *3 (S.D. Ohio Feb. 26, 2018) (enforcing procedural default based on the petitioner's failure to raise a claim on direct appeal). Regardless, these claims plainly lack merit.

not required." *United States v. Jones*, 766 F.2d 994, 998 n. 1 (6th Cir. 1985) (citation omitted).

Additionally,

> the "mere possibility" that the evidence might have aided the defense or might have affected the outcome of the trial does not satisfy the materiality element. *United States v. Agurs*, 427 U.S. 97, 109-10, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Also, a belated disclosure of evidence violates *Brady* only where a petitioner can show that the delay itself caused prejudice. *O'Hara v. Brigano*, 499 F.3d 492, 502 (6th Cir.2007).

*Overbay v. Carlton*, No. 2:07-cv-155, 2008 WL 4682802 (E.D. Tenn. Oct. 21, 2008). Further, a *Brady* claim can arise when the government induces testimony known to be perjurious or which the prosecutor should have known was perjurious. *See Ogle v. Mohr*, No. 2:15-cv-776, 2017 WL 951489, at *10 (S.D. Ohio Mar. 10, 2017) (citing *United States v. Frost*, 125 F.3d 346 (6th Cir. 1997)). To prevail on such a claim, the petitioner must show "(1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false." *Wogenstahl v. Mitchell*, 668 F.3d 307, 323 (6th Cir. 2012) (citing *Rosencrantz v. Lafler*, 568 F.3d 577, 583–84 (6th Cir. 2009)).

The appellate court found no support for Petitioner's allegation of false testimony by the prosecution witness. At the hearing on the motion for a new trial, the at-issue witness denied lying when she testified that Petitioner had a gun, and stated that she only later recanted that testimony because she felt bad about Petitioner's sentence and felt pressured. *Transcript* (ECF No. 7-2, PAGEID # 463-64.); *see also Davis v. Bradshaw*, No. 1:14-cv-2854, 2016 WL 8257676, at *29 (N.D. Ohio June 16, 2016) (citing *Carter v. Mitchell*, 443 F.3d 517, 539 (6th Cir. 2006)) ("Recantation testimony, particularly when it is belatedly submitted, is considered 'of little value' and 'viewed with great suspicion.'"). Additionally, Brianna Baker also testified that Petitioner had a gun. In summary, Petitioner has failed to rebut the presumption of correctness

afforded to the factual findings under 28 U.S.C. 2254(e)(1), and his claim of prosecutorial misconduct otherwise lacks record support.

Likewise, nothing in the record supports Petitioner's claim that his convictions violate the Confrontation Clause based on the prosecution's failure to call Jeremiah Marple as a prosecution witness. "[T]he Confrontation Clause does not require the prosecution to call all the witnesses it has against the defendant." *Whittaker v. Lafler*, 639 F.Supp.2d 818, 825 (E.D. Mich. 2009) (citing *United States v. Porter*, 764 F.2d 1, 9–10 (1st Cir. 1985)); *United States v. Moore*, 954 F.2d 379, 381 (6th Cir. 1992)). Nothing prevented Petitioner from calling Marple as a defense witness.

The undersigned therefore concludes that Petitioners claims one and three do not provide a basis for relief.

## B.    Claim Four

In claim four, Petitioner asserts that the trial court improperly imposed consecutive terms of incarceration in violation of state and federal law. Any claim premised upon an alleged violation of state law is not viable. *See, e.g.*, *Carrington v. Sloan*, No. 17-3709, 2018 WL 3244026, at *2 (6th Cir. Jan. 8, 2018) (consecutive sentencing claims are not cognizable in federal habeas corpus proceedings and do not provide federal habeas corpus relief, because they are based on alleged violations of state law) (citations omitted). A federal court may review a state prisoner's habeas petition only on the ground that the challenged confinement is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a). Put simply, a federal court may not issue a writ of habeas corpus "on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Smith v. Sowders*, 848 F.2d 735, 738 (6th Cir. 1988). This is because a federal habeas court does not function as an additional state appellate

court reviewing state courts' decisions on state law or procedure. *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988). "'[F]ederal courts must defer to a state court's interpretation of its own rules of evidence and procedure'" in considering a habeas petition. *Id.* (quoting *Machin v. Wainwright*, 758 F.2d 1431, 1433 (11th Cir. 1985)). Only where the error resulted in the denial of fundamental fairness will habeas relief be granted. *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988). Because such is not the case here, Plaintiff's claim premised upon his assertion that the trial court improperly imposed consecutive terms of incarceration must be dismissed.

## C.    **Claims Two and Four**

Plaintiff's second and fourth claims are procedurally defaulted and must therefore be dismissed.

Congress has provided that state prisoners who are in custody in violation of the Constitution or laws or treaties of the United States may apply to the federal courts for a writ of habeas corpus. 28 U.S.C. § 2254(a). In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required to present those claims to the state courts for consideration. 28 U.S.C. § 2254(b), (c). If he fails to do so, but still has an avenue open to him by which he may present his claims, his petition is subject to dismissal for failure to exhaust state remedies. *Id.; Anderson v. Harless*, 459 U.S. 4, 6, 103 (1982) (*per curiam*) (citing *Picard v. Connor*, 404 U.S. 270, 275–78 (1971)). Where a petitioner has failed to exhaust his claims but would find those claims barred if later presented to the state courts, "there is a procedural default for purposes of federal habeas . . . ." *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991).

The term "procedural default" has come to describe the situation where a person convicted of a crime in a state court fails (for whatever reason) to present a particular claim to the highest court of the State so that the State has a fair chance to correct any errors made in the course of the trial or the appeal before a federal court intervenes in the state criminal process. This requires the petitioner to present "the same claim under the same theory" to the state courts before raising it on federal habeas review. *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987). One of the aspects of "fairly presenting" a claim to the state courts is that a habeas petitioner must do so in a way that gives the state courts a fair opportunity to rule on the federal law claims being asserted. That means that if the claims are not presented to the state courts in the way in which state law requires, and the state courts therefore do not decide the claims on their merits, neither may a federal court do so. In the words used by the Supreme Court in *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977), "contentions of federal law which were not resolved on the merits in the state proceeding due to respondent's failure to raise them there as required by state procedure" also cannot be resolved on their merits in a federal habeas case; that is, they are procedurally defaulted.

In the Sixth Circuit, a four-part analysis must be undertaken when the State argues that a federal habeas claim is waived by the petitioner's failure to observe a state procedural rule. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). "First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule." *Id*. Second, the Court must determine whether the state courts actually enforced the state procedural sanction. *Id*. Third, the Court must determine whether the state procedural forfeiture is an adequate and independent state ground upon which the state can rely to foreclose review of a federal constitutional claim. *Id*. Finally, if the Court has determined that

the petitioner did not comply with a state procedural rule and that the rule was an adequate and independent state ground, then the petitioner must demonstrate cause for his failure to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error. *Id.* This "cause and prejudice" analysis applies to failures to raise or preserve issues for review at the appellate level. *Leroy v. Marshall,* 757 F.2d 94, 99 (6th Cir.), *cert. denied sub nom. Leroy v. Morris*, 474 U.S. 831 (1985).

In light of the fourth part of the *Maupin* analysis, in order to establish cause, a petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Constitutionally ineffective counsel may constitute cause to excuse a procedural default. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000). In order to constitute cause, an ineffective assistance of counsel claim generally must "be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default." *Murray*, 477 U.S. at 479. That is because, before counsel's ineffectiveness will constitute cause, "that ineffectiveness must itself amount to a violation of the Sixth Amendment, and therefore must be both exhausted and not procedurally defaulted." *Burroughs v. Makowski*, 411 F.3d 665, 668 (6th Cir.), *cert. denied*, 546 U.S. 1017 (2005). Or, if the claim is procedurally defaulted, petitioner must be able to "satisfy the 'cause and prejudice' standard with respect to the ineffective-assistance claim itself." *Edwards*, 529 U.S. at 450–51. The Supreme Court explained the importance of this requirement as follows:

> We recognized the inseparability of the exhaustion rule and the procedural-default doctrine in Coleman: "In the absence of the independent and adequate state ground doctrine in federal habeas, habeas petitioners would be able to avoid the exhaustion requirement by defaulting their federal claims in state court. The independent and adequate state ground doctrine ensures that the States' interest in correcting their own mistakes is respected in all federal habeas cases." 501 U.S., at 732, 111 S. Ct.

2546, 115 L.Ed.2d 640. We again considered the interplay between exhaustion and procedural default last Term in *O'Sullivan v. Boerckel*, 526 U.S. 838, 119 S. Ct. 1728, 144 L.Ed.2d 1 (1999), concluding that the latter doctrine was necessary to " 'protect the integrity' of the federal exhaustion rule." *Id*. at 848, 526 U.S. 838, 119 S. Ct. 1728, 144 L.Ed.2d 1 (quoting id., at 853, 526 U.S. 838, 119 S. Ct. 1728, 144 L.Ed.2d 1 (STEVENS, J., dissenting)). The purposes of the exhaustion requirement, we said, would be utterly defeated if the prisoner were able to obtain federal habeas review simply by " 'letting the time run' " so that state remedies were no longer available. *Id*. at 848, 526 U.S. 838, 119 S. Ct. 1728, 144 L.Ed.2d 1. Those purposes would be no less frustrated were we to allow federal review to a prisoner who had presented his claim to the state court, but in such a manner that the state court could not, consistent with its own procedural rules, have entertained it. In such circumstances, though the prisoner would have "concededly exhausted his state remedies," it could hardly be said that, as comity and federalism require, the State had been given a "fair 'opportunity to pass upon [his claims].' " *Id*. at 854, 526 U.S. 838, 119 S. Ct. 1728, 144 L.Ed.2d 1 (STEVENS, J., dissenting) (emphasis added) (quoting *Darr v. Burford*, 339 U.S. 200, 204, 70 S. Ct. 587, 94 L.Ed. 761 (1950)).

*Id*. at 452–53.

If, after considering all four factors of the *Maupin* test, the Court concludes that a procedural default occurred, it must not consider the procedurally defaulted claim on the merits unless "review is needed to prevent a fundamental miscarriage of justice, such as when the petitioner submits new evidence showing that a constitutional violation has probably resulted in a conviction of one who is actually innocent." *Hodges v. Colson*, 727 F.3d 517, 530 (6th Cir. 2013) (citing *Murray*, 477 U.S. at 495–96), *cert. denied*, 135 S. Ct. 1545 (2015).

Applied here, in claim two, Petitioner asserts that he was denied the effective assistance of counsel, because his attorney failed to request a jury instruction on duress. In claim four, Petitioner asserts that the trial court violated the Double Jeopardy Clause by imposing consecutive terms of incarceration on his convictions, which he maintains should have been merged as based on "the same act of violence." (*Petition*, ECF No. 3, PAGEID # 39.) Petitioner properly raised these claims on direct appeal; however, he thereafter failed to file a timely appeal, and the Ohio Supreme Court denied his motion for a delayed appeal. Petitioner thereby

has committed a procedural default as to both of these claims. *See Smith v. State of Ohio Dep't of Rehab. & Corr.*, 463 F.3d 426, 431-32 (6th Cir. 2006) (citing *Bonilla v. Hurley*, 370 F.3d 494, 497 (6th Cir. 2004)).

Petitioner also asserts in claim two that he was denied the effective assistance of trial counsel, because his attorney failed to call defense witnesses. Respondent correctly notes that Petitioner likewise has procedurally defaulted this claim, as he has never presented this claim to the state courts and now may no longer do so. To the extent that this claim relies on evidence that is readily apparent from the face of the record, the claim should have been raised on direct appeal, but was not. Petitioner may now no longer present this issue to the state courts by application of Ohio's doctrine of *res judicata*. "It is well-settled that '[c]laims appearing on the face of the record must be raised on direct appeal, or they will be waived under Ohio's doctrine of res judicata.'" *Teitelbaum v. Turner*, No. 2:17-cv-583, 2018 WL 2046456, at *15 (S.D. Ohio May 2, 2018) (citing *Hill v. Mitchell*, No. 1:98-CV-452, 2006 WL 2807017, at *43 (S.D. Ohio Sept. 27, 2006) (citing *State v. Perry*, 10 Ohio St.2d 175, 226 N.E.2d 104 (1967))). Petitioner violated the *res judicata* rule set forth in *Perry* when he failed to raise those claims on direct appeal, and, consequently, the first prong of the *Maupin* test is satisfied. Moreover, Ohio courts have consistently relied upon the doctrine of *res judicata* to refuse to review the merits of procedurally barred claims. *See, e.g., State v. Cole*, 2 Ohio St.3d 112, 443 N.E.2d 169 (1982). Further, the Sixth Circuit has held that Ohio's doctrine of *res judicata* is an independent and adequate ground for denying federal habeas relief. *See, e.g., Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir. 2006); *Coleman v. Mitchell*, 268 F.3d 417, 427–29 (6th Cir. 2001); *Seymour v. Walker*, 224 F.3d 542, 555 (6th Cir. 2000); *Byrd v. Collins*, 209 F.3d 486, 521–22 (6th Cir. 2000); *Norris v. Schotten*, 146 F.3d 314, 332 (6th Cir. 1998). Turning to *Maupin's* independence

prong, under the circumstances presented here, Ohio's doctrine of *res judicata* does not rely on or otherwise implicate federal law. Accordingly, the undersigned finds that the first three *Maupin* factors are satisfied.

The undersigned notes that to the extent that Petitioner's claim relies upon off-the-record evidence, it could properly be raised in a state post-conviction action; however, the time period for filing such an action has long since expired, and the record does not reflect that Petitioner could meet the stringent requirements for consideration of his claim in an untimely post-conviction action. *See* O.R.C. § 2953.23; *see also Johnson*, 2017 WL 2633188, at *3 (enforcing procedural default under these same circumstances) (citing *Moore v. Mitchell*, 708 F.3d 760, 776 (6th Cir. 2013)).

Petitioner may still secure review of his claims on the merits if he establishes cause for his procedural defaults as well as actual prejudice from the alleged constitutional violations. According to Petitioner, neither his attorney nor the clerk notified him of the appellate court's November 17, 2016 decision denying his appeal, and that he did not learn, until January 29, 2017, through a fellow inmate, that his appeal had been denied. (ECF No. 7, PAGEID # 204.)

An attorney's failure to timely notify his client of the resolution of proceedings, resulting in the defendant's forfeiture of his appeal, may constitute cause for a procedural default. *See Johnson v. Turner*, No. 2:14-cv-01908, 2016 WL 6963177, at *3-4 (S.D. Ohio Nov. 29, 2016) (citing *Smith v. State of Ohio Dep't of Rehab. & Corr.*, 463 F.3d 426, 534 (6th Cir. 2006) ("[C]ounsel has a duty to inform the accused of the resolution of a proceeding in a timely fashion so that the accused retains his control over the decision to appeal.") (other citations omitted)). However, this claim does not assist Petitioner here, because he never presented it as an independent claim to the state courts through the filing of an application to reopen the appeal

pursuant to Ohio Appellate Rule 26(B). *Edwards v. Carpenter*, 529 U.S. at 450-51 (the

constitutionally ineffective assistance of counsel may constitute cause for a procedural default,

only if the claim has been presented to the state courts and is not, itself, procedurally defaulted)

(citing *Murray v. Carrier*, 477 U.S. 478, 488-89 (1986)).

> "*Smith*. . . recognized that '[a] claim of ineffective assistance of counsel must be
> presented to the state courts as an independent claim before it may be used to
> establish cause for procedural default.' " *Stout v. Warden, Toledo Correctional
> Inst.*, No. 3:12-cv-1415, 2014 WL 1682824, at *9 (N.D. Ohio April 17, 2014 (citing
> *Bleigh v. Brunsman*, No. 2:11-cv-628, 2012 WL 668819, at *12 (S.D. Ohio Feb.
> 29, 2012)) (quoting *Smith,* 463 F.3d at 436, n. 7); *Barkley*, 240 F.Supp.2d at 715
> ("Because [petitioner] failed to present this claim [of ineffective assistance of
> appellate counsel] as an independent claim to the state courts, it cannot constitute
> cause for [petitioner's] procedural default of his habeas claim."). "[A] petitioner
> cannot use the ineffective assistance of appellate counsel as cause to excuse a
> procedurally defaulted claim when he has failed to present the claim of the
> ineffectiveness of appellate counsel as an independent claim or has otherwise
> procedurally defaulted that claim." *Tomilinson v. Bradshaw*, No. 5:13-cv-1808,
> 2015 WL 106060, at *17 (N.D. Ohio Jan. 7, 2015) (citing *Smith*, 463 F.3d at 436);
> *Stout v. Warden, Toledo Corr. Inst*., No. 3:12–CV–1415, 2014 WL 1682824, at *9
> (N.D. Ohio, Apr. 17, 2014)(internal quotation omitted)(concluding that the
> petitioner had procedurally defaulted his claim of ineffective assistance of appellate
> counsel by failing to present it "as a separate claim or as any claim beyond his
> motion for delayed appeal to the Ohio Supreme Court.").

*Johnson*, 2016 WL 6963177, at *5. Here, Petitioner did not pursue a Rule 26(B) application, and

he has failed to otherwise establish cause for his procedural defaults.

Finally, the United States Supreme Court has held that a claim of actual innocence may

be raised "to avoid a procedural bar to the consideration of the merits of [a petitioner's]

constitutional claims." *Schlup v. Delo*, 513 U.S. 298, 326–27 (1995). "[I]n an extraordinary

case, where a constitutional violation has probably resulted in the conviction of one who is

actually innocent, a federal habeas court may grant the writ even in the absence of a showing of

cause for the procedural default." *Murray*, 477 U.S. at 496. In *Schlup*, the Supreme Court held

that a credible showing of actual innocence was sufficient to enable a court to reach the merits of

an otherwise procedurally-barred habeas petition. *Schlup*, 513 U.S. at 317. The actual

innocence claim in *Schlup* is "'not itself a constitutional claim, but instead a gateway through

which a habeas petitioner must pass to have his otherwise barred constitutional claim considered

on the merits.'" *Id.* at 315 (quoting *Herrera v. Collins*, 506 U. S. 390, 404 (1993)).

The actual innocence exception allows a petitioner to pursue his constitutional claims if it

is "more likely than not" that new evidence—not previously presented at trial—would allow no

reasonable juror to find him guilty beyond a reasonable doubt. *Souter v. Jones*, 395 F.3d 577

(6th Cir. 2005). In *Souter*, the Sixth Circuit offered the following explanation:

> The United States Supreme Court has held that if a habeas petitioner "presents
> evidence of innocence so strong that a court cannot have confidence in the outcome
> of the trial unless the court is also satisfied that the trial was free of nonharmless
> constitutional error, the petitioner should be allowed to pass through the gateway
> and argue the merits of his underlying claims." *Schlup*, 513 U.S. at 316, 115 S.Ct.
> 851, 130 L.Ed.2d 808. Thus, the threshold inquiry is whether "new facts raise[ +]
> sufficient doubt about [the petitioner's] guilt to undermine confidence in the result
> of the trial." Id. at 317, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808. To establish
> actual innocence, "a petitioner must show that it is more likely than not that no
> reasonable juror would have found petitioner guilty beyond a reasonable doubt."
> *Id.* at 327, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808. The Court has noted that
> "actual innocence means factual innocence, not mere legal insufficiency." *Bousley
> v. United States*, 523 U.S. 614, 623, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998). "To
> be credible, such a claim requires petitioner to support his allegations of
> constitutional error with new reliable evidence-whether it be exculpatory scientific
> evidence, trustworthy eyewitness accounts, or critical physical evidence-that was
> not presented at trial." *Schlup*, 513 U.S. at 324, 115 S.Ct. 851, 130 L.Ed.2d 808.
> The Court counseled however, that the actual innocence exception should "remain
> rare" and "only be applied in the 'extraordinary case.' " *Id.* at 321, 513 U.S. 298,
> 115 S.Ct. 851, 130 L.Ed.2d 808.

*Souter*, 395 F.3d at 589–90 (footnote omitted). Petitioner does not meet these standards.

For the foregoing reasons, Petitioner's claims two and four are waived.

### IV.    Disposition

For the reasons set forth above, it is **RECOMMENDED** that this action be

**DISMISSED**.

**Procedure on Objections**

If any party objects to this *Report and Recommendation*, that party may, within fourteen days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo,* and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

/s/ *Chelsey M. Vascura*
CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE